/

United States District Court
Southern District of Texas
FILED

JAN 2 8 2003

Michael N. Milby
Clerk of Court

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **WELLS FARGO BANK TEXAS, N.A.** | § | |
| **Plaintiff** | § | |
| | § | |
| | § | **B-03-026** |
| **v.** | § | CIVIL ACTION NO._____ |
| | § | |
| **JULIE MARIE, INC., ENRIQUETA H.** | § | |
| **BARRERA and the F/V JULIE MARIE,** | § | |
| **her engines, nets, tackle, apparel,** | § | **IN ADMIRALTY** |
| **and furniture, etc.,** *in rem,* | § | |
| **Defendants** | § | |

---

## PLAINTIFF'S COMPLAINT

---

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW **WELLS FARGO BANK TEXAS, N.A.**, Plaintiff herein, complaining of **JULIE MARIE, INC.,** *in personam,* the owner of the named vessel, **F/V JULIE MARIE**, her engines, nets, tackle, apparel, and furniture, etc. *in rem,* and **ENRIQUETA H. BARRERA**, individually as guarantor, herein collectively referred to as Defendants, and for cause of action would respectfully show unto the Court the following:

I.

### PARTIES

1.      Plaintiff is a national banking association, with an office and its principal place of business at 1800 W. Highway 100, Port Isabel, Texas 78578.

---

2.    Defendant **JULIE MARIE, INC.**, is a Texas corporation, having its principal place of business in Cameron County, Texas, may be served with process by serving its registered agent for process DAVID KRUMMELL at Channel Rd., P. O. Box 211, Port Isabel, Texas 78578.

3.    Defendant **ENRIQUETA H. BARRERA** is an individual, resident of Cameron County, Texas, who may be served with process at her residence at 1213 Hwy 100, Laguna Heights, Texas 78578.

4.    Defendant **F/V JULIE MARIE**, formerly known as F/V GALLANT CLIPPER, Official Number 537957, is a fishing vessel, believed to be wholly owned by Defendant **JULIE MARIE, INC.** On information and belief the **F/V JULIE MARIE** is now or during the pendency of this action will be, within this District and which may be found for service of process and arrested at the docks at Port Isabel, Texas.

II.

## JURISDICTION AND VENUE

5.    This is a case involving admiralty and maritime jurisdiction within the meaning of Rule 9(h) and Supplemental Rule C of the Federal Rules of Civil Procedure. This Court has subject matter jurisdiction under 46 USC §31342 and 28 USC §1333.   The Defendant Vessel is, or will be, during the pendency of the process within this district and within the jurisdiction of this court.

III.

## FACTS OF THE CASE

6.    On or about the October 26, 1993, **JULIE MARIE, INC.** executed and delivered to the **WELLS FARGO BANK TEXAS, N.A.**, or its predecessor in interest,

(hereinafter sometimes referred to as "**WELLS FARGO**"), a promissory note bearing such date and year in the principal amount of $30,000.00 and thereby promised to pay to the order of **WELLS FARGO**, the principal sum of $30,000.00, plus accrued interest as stated in the Note and any and all extensions and/or modifications to the Note.

On or about February 18, 1999, **JULIE MARIE, INC.** executed and delivered to **WELLS FARGO BANK TEXAS, N.A.** assignee of FIRST VALLEY BANK (hereinafter sometimes referred to as "**WELLS FARGO**"), a Note bearing such date and year in the principal amount of $40,000.00, and on June 4, 1999, and May 4, 2000 executed and delivered Renewal, Enlargement and Modification of Note bearing such dates and years, the last renewal in the principal amount of $69,981.14, and thereby promised to pay to the order of **WELLS FARGO**, the principal sum of $69,981.14, plus accrued interest

"...of 1.5 percentage points over the Index, adjusted if necessary for the maximum rate limitation described below, resulting in an initial rate of 10.50 percent per annum..."

True and correct copies of the Note and Renewal are attached hereto as **Exhibit "A"**.

7.     The Note further provides that the holder is authorized to declare all or any part of the indebtedness immediately due and payable upon the happening of any of several events including the "failure to pay any part of the indebtedness when due" or "nonperformance" by the signor.

8.     At the time of the execution of the note **JULIE MARIE, INC.** was the sole owner of the **F/V JULIE MARIE**, Official Number 537957. To secure the payment of said note, **JULIE MARIE, INC.** duly executed and delivered to the **WELLS FARGO** a preferred

mortgage upon said vessel, dated October 26,1993 and cited in the latest Renewal, Enlargement and Modification Note of May 4, 2000.

9.     In pertinent part, the mortgage provides that in the event of default in the payment of the principal of the note or any installment thereof the holder may declare the principal of said note and all accrued interest to be due and payable forthwith.

10.    On or about May 4, 2000, Defendant **ENRIQUETA H. BARRERA** executed her personal guarantee of the Note which provided in pertinent part:

> "...For good and valuable consideration, **ENRIQUETA H. BARRERA** ("Guarantor") absolutely and unconditionally guarantees and promises to pay to **WELLS FARGO BANK TEXAS, N.A.** ("Lender") or its order, in legal tender of the United States of America the indebtedness (as that term is defined below) of **JULIE MARIE, INC.** ("Borrower") to Lender on the terms and conditions set forth in this Guaranty. Under this Guaranty, the liability of Guarantor is unlimited and the obligations of Guarantor are continuing...."

A copy of WELLS FARGO guaranty executed by **ENRIQUETA H. BARRERA** is attached hereto as **Exhibit "B"** and incorporated by reference as if fully set forth at length.

11.    On May 4, 2000, Defendant **JULIE MARIE, INC.** executed a Commercial Security Agreement to secure the payment of said note, and granted **WELLS FARGO** a security interest in the **F/V JULIE MARIE** referred to in said Commercial Security Agreement as Fpsm M/V "Julie Marie".

A copy of the Commercial Security Agreement is attached hereto as **Exhibit "C"** and incorporated herein as if fully set forth at length.

12.    On May 4, 2000, **JULIE MARIE, INC.** amended the preferred mortgage, said amendment updating the Mortgagee (transferee) and increasing the principal amount due to $69,981.14.

A copy of the modification is attached hereto as **Exhibit "D"** and incorporated herein as if fully set forth at length.

13.    The Defendants have defaulted in the payment of the Note.

14.    Plaintiff is the legal owner and holder of such note and the entity entitled to enforce it.  Plaintiff has made presentment and formal written demand upon Defendants to pay the Note.  Defendants failed and refused to pay same and the Note, having matured and become due and payable by virtue of such default, has been placed in the hands of the undersigned attorneys for collection, agreeing to pay them attorneys' fees as provided in the Note.

15.    Defendants are indebted to Plaintiff in the principal amount of $50,325.14 plus accrued interest in the amount of $4,221.38 and such interest as may accrue according to the modification until paid.  Defendants are further indebted to Plaintiff for a line of credit in the principal amount of $26,000.00 plus accrued interest in the amount of $2,044.61 and such interest as may accrue until paid.

A copy of the credit agreement is attached hereto as **Exhibit "E"** incorporated herein as if fully set forth at length.

16.    Plaintiff has and claims a maritime lien against the Defendant vessel in the amount of the accelerated principal and interest due to date plus default interest as stated in the Note.

IV.

## ATTORNEYS' FEES

Plaintiff would further show the court that by reason of the Defendants' default and failure to cure their default upon demand, Plaintiff has been required to retain the

services of the undersigned attorneys and is entitled to recoup reasonable attorneys' fees in connection with the collection of said promissory note, line of credit and foreclosure of its preferred mortgage in an amount of at least $8,259.11.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays:

A.  that process in due form of law according to the rules and practice of this court in causes of maritime and admiralty jurisdiction may issue against the vessel the **F/V JULIE MARIE**, her engines, tackle, etc., citing all persons claiming any interest to appear and answer on oath all and singular the matters stated above and that said Vessel, her engine, tackle, apparel, etc. and all other necessaries thereunto belonging and appertaining, be condemned and sold to pay the demands and claims aforesaid with interest;

B.  that process be issued against the Defendant **JULIE MARIE, INC.**, and Defendant Guarantor **ENRIQUETA H. BARRERA** named herein;

C.  that Plaintiff's claim be established as a maritime lien in the amount set forth above against the named Defendant Vessel;

D.  that Plaintiff recover the full amount of the indebtedness, jointly and severally, from the *in personam* defendant, **JULIE MARIE, INC.** and guarantor Defendant **ENRIQUETA H. BARRERA**;

E.  that Plaintiff recover prejudgment and postjudgment interest as provided by the terms of the Note and law and costs of suit;

F.  that Plaintiff recover reasonable attorneys' fees; and

G.  for such other and further relief to which Plaintiff may be justly entitled.

Respectfully Submitted,

RENTFRO, FAULK & BLAKEMORE, LLP
185 E. Ruben M. Torres Sr. Blvd.
Brownsville, TX 78520-9136
(956) 541-9600-phone
(956) 541-9695-facsimile

T. MARK BLAKEMORE
SBN: 02431800
Federal Admn. No. 1915

ATTORNEYS FOR PLAINTIFF

## VERIFICATION

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared, KEVIN D. MULLETT, who, being by me first duly sworn, deposed and said:

"My name is KEVIN D. MULLETT. I am the Vice President of WELLS FARGO BANK TEXAS, N.A., Plaintiff in the above and foregoing entitled and numbered action. In my capacity, I am familiar with the operations and billing records of WELLS FARGO BANK TEXAS, N.A. I have read the foregoing Plaintiff's Complaint and the contents thereof are true and correct and within my own personal knowledge."

FURTHER AFFIANT SAITH NOT.

_____
KEVIN D. MULLETT

SWORN TO AND SUBSCRIBED BEFORE ME by the said, KEVIN D. MULLETT, Vice President of WELLS FARGO BANK TEXAS, N.A. which witness my hand and seal of office this 22 day of January, 2003.

NORA E MARTINEZ
Notary Public
STATE OF TEXAS
My Comm. Exp. 06-14-2006

Notary Public, State of Texas

| JULIE MARIE INC<br>PO BOX 711<br>PORT ISABEL TX 78578-0711 | FIRST VALLEY BANK-PHARR DWNTN<br>118 SOUTH CAGE<br>PHARR TEXAS 78577 | Loan Number | 273239224 |
|---|---|---|---|
| | | Date | 2/18/99 |
| | | Maturity Date | 6/04/99 |
| | | Loan Amount $ | 40,000.00 |
| **BORROWER'S NAME AND ADDRESS**<br>"I" includes each borrower above, joint and severally | **LENDER'S NAME AND ADDRESS**<br>"You" means the lender, its successors and assigns. | Renewal Of<br>SRJ/SRJ | |

For value received, I promise to pay to you, or your order, at your address listed above the **PRINCIPAL** sum of
FORTY THOUSAND AND NO/100 _____ Dollars $ _____ 40,000.00 _____

[X] **Single Advance:** I will receive all of this principal sum on _____ 2/18/99 _____ . No additional advances are contemplated under this note.

[ ] **Multiple Advance:** The principal sum shown above is the maximum amount of principal I can borrow under this note. On _____
_____ I will receive the amount of $ _____ and future principal advances are contemplated.
Conditions: The conditions for future advances are _____
_____

   [ ] **Open End Credit:** You and I agree that I may borrow up to the maximum amount of principal more than one time. This feature is subject to
all other conditions and expires on _____.

   [X] **Closed End Credit:** You and I agree that I may borrow up to the maximum only one time (and subject to all other conditions).

**INTEREST:** I agree to pay interest on the outstanding principal balance from _____ 2/18/99 _____ at the rate of _____ 7.670 _____ % per
year until _____ 6/04/99 _____ .

[ ] **Variable Rate:** This rate may then change as stated below.
   [ ] **Index Rate:** The future rate will be _____ the following index rate: _____
_____
_____

   [ ] **Ceiling Rate:** The interest rate ceiling for this note is the _____ ceiling rate announced by the Credit Commissioner from time to time.

   [ ] **Frequency and Timing:** The rate on this note may change as often as _____
A change in the interest rate will take effect _____.

   [ ] **Limitations:** During the term of this loan, the applicable annual interest rate will not be more than _____ % or less than
_____ %. The rate may not change more than _____ % each _____ .

   **Effect of Variable Rate:** A change in the interest rate will have the following effect on the payments:
   [ ] The amount of each scheduled payment will change.   [ ] The amount of the final payment will change.
   [ ] _____

**ACCRUAL METHOD:** Interest will be calculated on a _____ actual/360 _____ basis.

**POST MATURITY RATE:** I agree to pay interest on the unpaid balance of this note owing after maturity, and until paid in full, as stated below:
   [ ] on the same fixed or variable rate basis in effect before maturity (as indicated above).
   [X] at a rate equal to _____ 18.000% _____

[ ] **LATE CHARGE:** If a payment is made more than _____ days after it is due, I agree to pay a late charge of _____

[ ] **ADDITIONAL CHARGES:** In addition to interest, I agree to pay the following charges which [ ] are [ ] are not included in the principal amount
above: _____

**PAYMENTS:** I agree to pay this note as follows:
[ ] **Interest:** I agree to pay accrued interest _____
_____

[ ] **Principal.** I agree to pay the principal _____
_____

[X] **Installments:** I agree to pay this note in _____ 3 _____ payments. The first payment will be in the amount of $ _____ 1,000.00 _____
and will be due _____ April 04, 1999 _____ . A payment of $ _____ 1,000.00 _____ will be due **on the 4th**
**day of each month** _____ thereafter. The final payment of the entire
unpaid balance of principal and interest will be due _____ 6/04/99 _____

**ADDITIONAL TERMS:**

---

| **THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**<br><br>**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.** |
|---|

[ ] **SECURITY:** This note is separately secured by (describe separate
document by type and date): _____

(This section is for your internal use. Failure to list a separate security document does not
mean the agreement will not secure this note.)

**PURPOSE:** The purpose of this loan is _____ BOAT MAINTENANCE _____

**SIGNATURES: I AGREE TO THE TERMS OF THIS NOTE (INCLUDING
THOSE ON PAGE 2).** I have received a copy on today's date

Signature for Lender

_signature_

SAMMY REYES

BUSINESS BANKER

JULIE MARIE INC.

_signature_ PRESIDENT

ENRIQUETA H BARRERA

**DEFINITIONS.** As used on page 1, "I," means the terms that apply to this loan. "I," "me" or "my" means each Borrower who signs this note with each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this note (together referred to as "us"). "You" or "your" means the Lender and its successors and assigns.

**APPLICABLE LAW:** The law of the state of Texas will govern this note. Any term of this note which is contrary to applicable law will not be effective, unless the law permits you and me to agree to such a variation. If any provision of this agreement cannot be enforced according to its terms, this fact will not affect the enforceability of the remainder of this agreement. No modification of this agreement may be made without your express written consent. Time is of the essence in this agreement.

**PAYMENTS:** Each payment I make on this note will first reduce the amount I owe you for charges which are neither interest nor principal. The remainder of each payment will then reduce accrued unpaid interest, and then unpaid principal. If you and I agree to a different application of payments, we will describe our agreement on this note. I may prepay a part of, or the entire balance of this loan without penalty, unless we specify to the contrary on this note. Any partial prepayment will not excuse or reduce any later scheduled payment until this note is paid in full (unless, when I make the prepayment, you and I agree in writing to the contrary).

**INTEREST:** Interest accrues on the principal remaining unpaid from time to time, until paid in full. If I receive the principal in more than one advance, each advance will start to earn interest only when I receive the advance. The interest rate in effect on this note at any given time will apply to the entire principal advanced at that time. Notwithstanding anything to the contrary, I do not agree to pay and you do not intend to charge any rate of interest that is higher than the maximum rate of interest you could charge under applicable law for the extension of credit that is agreed to here (either before or after maturity). If any notice of interest accrual is sent and is in error, we mutually agree to correct it, and if you actually collect more interest than allowed by law and this agreement, you agree to refund it to me.

**INDEX RATE:** The index will serve only as a device for setting the rate on this note. You do not guarantee by selecting this index, or the margin, that the rate on this note will be the same rate you charge on any other loans or class of loans to me or other borrowers.

**ACCRUAL METHOD:** The amount of interest that I will pay on this loan will be calculated using the interest rate and accrual method stated on page 1 of this note. For the purpose of interest calculation, the accrual method will determine the number of days in a "year." If no accrual method is stated, then you may use any reasonable accrual method for calculating interest.

**POST MATURITY RATE:** For purposes of deciding when the "Post Maturity Rate" (shown on page 1) applies, the term "maturity" means the date of the last scheduled payment indicated on page 1 of this note or the date you accelerate payment on the note, whichever is earlier.

**SINGLE ADVANCE LOANS:** If this is a single advance loan, you and I expect that you will make only one advance of principal. However, you may add other amounts to the principal if you make any payments described in the "PAYMENTS BY LENDER" paragraph below.

**MULTIPLE ADVANCE LOANS:** If this is a multiple advance loan, you and I expect that you will make more than one advance of principal. If this is closed end credit, repaying a part of the principal will not entitle me to additional credit.

**PAYMENTS BY LENDER:** If you are authorized to pay, on my behalf, charges I am obligated to pay (such as property insurance premiums), then you may treat those payments made by you as advances and add them to the unpaid principal under this note, or you may demand immediate payment of the charges.

**SET-OFF:** I agree that you may set off any amount due and payable under this note against any right I have to receive money from you.

"Right to receive money from you" means:
(1) any deposit account balance I have with you;
(2) any money owed to me on an item presented to you or in your possession for collection or exchange; and
(3) any repurchase agreement or other nondeposit obligation.

"Any amount due and payable under this note" means the total amount of which you are entitled to demand payment under the terms of this note at the time you set off. This total includes any balance the due date for which you properly accelerated under this note.

If my right to receive money from you is also owned by someone who has not agreed to pay this note, your right of set-off will apply to my interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement. Your right of set-off does not apply to an account or other obligation where my rights are only as a representative. It also does not apply to any Individual Retirement Account or other tax-deferred retirement account.

You will not be liable for the dishonor of any check when the dishonor occurs because you set off this debt against any of my accounts. I agree to hold you harmless from any such claims arising as a result of your exercise of your right of set-off.

**REAL ESTATE OR RESIDENCE SECURITY:** If this note is secured by real estate or a residence that is personal property, the existence of a default and your remedies for such a default will be determined by applicable law, by the terms of any separate instrument creating the security interest and, to the extent not prohibited by law and not contrary to the terms of the separate security instrument, by the "Default" and "Remedies" paragraphs herein.

**DEFAULT:** I will be in default on this loan and any agreement securing this loan if any one or more of the following occurs:
(1) I fail to perform any obligation which I have undertaken in this note or any agreement securing this note; or
(2) you, in good faith, believe that the prospect of payment or the prospect of my performance of any other of my obligations under this note or any agreement securing this note is impaired.

If any of us are in default on this note or any security agreement, you may exercise your remedies against any or all of us.

**REMEDIES:** If I am in default on this note you have, but are not limited to, the following remedies:
(1) You may demand immediate payment of my debt under this note (principal, accrued unpaid interest and other accrued charges).
(2) You may set off this debt against any right I have to the payment of money from you, subject to the terms of the "Set-Off" paragraph herein.
(3) You may demand security, additional security, or additional parties to be obligated to pay this note as a condition for not using any other remedy.
(4) You may refuse to make advances to me or allow purchases on credit by me.
(5) You may use any remedy you have under state or federal law.

By selecting any one or more of these remedies you do not give up your right to later use any other remedy. By waiving your right to declare an event to be a default, you do not waive your right to later consider the event as a default if it continues or happens again.

**COLLECTION COSTS AND ATTORNEY'S FEES:** I agree to pay all costs of collection, replevin or any other or similar type of cost if I am in default. In addition, if you hire an attorney to collect this note, I also agree to pay any fee you incur with such attorney plus court costs (except where prohibited by law). To the extent permitted by the United States Bankruptcy Code, I also agree to pay the reasonable attorney's fees and costs you incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

**WAIVER:** I give up my rights to require you to do certain things. I will not require you to:
(1) demand payment of amounts due (presentment);
(2) obtain official certification of nonpayment (protest);
(3) give notice that amounts due have not been paid (notice of dishonor);
(4) give notice of intent to accelerate; or
(5) give notice of acceleration.

I waive any defenses I have based on suretyship or impairment of collateral.

**OBLIGATIONS INDEPENDENT:** I understand that I must pay this note even if someone else has also agreed to pay it (by, for example, signing this form or a separate guarantee or endorsement). You may sue me alone, or anyone else who is obligated on this note, or any number of us together, to collect this note. You may do so without any notice that it has not been paid (notice of dishonor). You may without notice release any party to this agreement without releasing any other party. If you give up any of your rights, with or without notice, it will not affect my duty to pay this note. Any extension of new credit to any of us, or renewal of this note by all or less than all of us will not release me from my duty to pay it. (Of course, you are entitled to only one payment in full.) I agree that you may at your option extend this note or the debt represented by this note, or any portion of the note or debt, from time to time without limit or notice and for any term without affecting my liability for payment of the note. I will not assign my obligation under this agreement without your prior written approval.

**CREDIT INFORMATION:** I agree and authorize you to obtain credit information about me from time to time (for example, by requesting a credit report) and to report to others your credit experience with me (such as a credit reporting agency). I agree to provide you, upon request, any financial statement or information you may deem necessary. I warrant that the financial statements and information I provide to you are or will be accurate, correct and complete.

**NOTICE:** Unless otherwise required by law, any notice to me shall be given by delivering it or by mailing it by first class mail addressed to me at my last known address. My current address is on page 1. I agree to inform you in writing of any change in my address. I will give any notice to you by mailing it first class to your address stated on page 1 of this agreement, or to any other address that you have designated.

| DATE OF TRANSACTION | PRINCIPAL ADVANCE | BORROWER'S INITIALS (not required) | PRINCIPAL PAYMENTS | PRINCIPAL BALANCE | INTEREST RATE | INTEREST PAYMENTS | INTEREST PAID THROUGH |
|---|---|---|---|---|---|---|---|
| / / | $ | | $ | $ | % $ | | / / |
| / / | $ | | $ | $ | % $ | | / / |
| / / | $ | | $ | $ | % $ | | / / |
| / / | $ | | $ | $ | % $ | | / / |
| / / | $ | | $ | $ | % $ | | / / |
| / / | $ | | $ | $ | % $ | | / / |
| / / | $ | | $ | $ | % $ | | / / |
| / / | $ | | $ | $ | % $ | | / / |
| / / | $ | | $ | $ | % $ | | / / |
| / / | $ | | $ | $ | % $ | | / / |

*(page 2 of 2)*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call | Collateral | Account | Officer | Initials |
|-----------|-----------|----------|---------|------|------------|---------|---------|----------|
| $37,892.13 | 06-04-1999 | 06-04-2000 | 9002 | | | 0260692 | B3161 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

**Borrower:**  JULIE MARIE INC. (TIN: 742132782)  
P O BOX 711  
PORT ISABEL, TX 78578

**Lender:**  NORWEST BANK TEXAS, N.A.  
BROWNSVILLE MAIN  
835 EAST LEVEE  
BROWNSVILLE, TX 78522

**Principal Amount: $37,892.13**      **Interest Rate: 7.000%**      **Date of Note: June 4, 1999**

**PROMISE TO PAY.** JULIE MARIE INC. ("Borrower") promises to pay to NORWEST BANK TEXAS, N.A. ("Lender"), or order, in lawful money of the United States of America, the principal amount of Thirty Seven Thousand Eight Hundred Ninety Two & 13/100 Dollars ($37,892.13), together with interest at the rate of 7.000% per annum on the unpaid principal balance from June 4, 1999, until maturity.

**PAYMENT.** Borrower will pay this loan in 11 regular payments of $1,000.00 each and one irregular last payment estimated at $29,279.47. Borrower's first payment is due July 4, 1999, and all subsequent payments are due on the same day of each month after that. Borrower's final payment due June 4, 2000, will be for all principal and all accrued interest not yet paid. Payments include principal and interest. The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding, unless such calculation would result in a usurious rate, in which case interest shall be calculated on a per diem basis of a year of 365 or 366 days, as the case may be. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing. Unless otherwise agreed or required by applicable law, payments will be applied first to accrued unpaid interest, then to principal, and any remaining amount to any unpaid collection costs and late charges.

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, they will reduce the principal balance due and may result in Borrower making fewer payments.

**POST MATURITY RATE.** The Post Maturity Rate on this Note is 18.000% per annum. Borrower will pay interest on all sums due after final maturity, whether by acceleration or otherwise, at that rate, with the exception of any amounts added to the principal balance of this Note based on Lender's payment of insurance premiums, which will continue to accrue interest at the pre-maturity rate.

**DEFAULT.** Borrower will be in default if any of the following happens: (a) Borrower fails to make any payment when due. (b) Borrower breaks any promise Borrower has made to Lender, or Borrower fails to comply with or to perform when due any other term, obligation, covenant, or condition contained in this Note or any agreement related to this Note, or in any other agreement or loan Borrower has with Lender. (c) Any representation or statement made or furnished to Lender by Borrower or on Borrower's behalf is false or misleading in any material respect either now or at the time made or furnished. (d) Borrower becomes insolvent, a receiver is appointed for any part of Borrower's property, Borrower makes an assignment for the benefit of creditors, or any proceeding is commenced either by Borrower or against Borrower under any bankruptcy or insolvency laws. (e) Any creditor tries to take any of Borrower's property on or in which Lender has a lien or security interest. This includes a garnishment of any of Borrower's accounts with Lender. (f) Any guarantor dies or any of the other events described in this default section occurs with respect to any guarantor of this Note. (g) A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired. (h) Lender in good faith deems itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire indebtedness, including the unpaid principal balance on this Note, all accrued unpaid interest, and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, immediately due, without notice, and then Borrower will pay that amount. Lender may hire an attorney to help collect this Note if Borrower does not pay, and Borrower will pay Lender's reasonable attorneys' fees. Borrower also will pay Lender all other amounts actually incurred by Lender as court costs, lawful fees for filing, recording, or releasing to any public office any instrument securing this loan; the reasonable cost actually expended for repossessing, storing, preparing for sale, and selling any security; and fees for noting a lien on or transferring a certificate of title to any motor vehicle offered as security for this loan, or premiums or identifiable charges received in connection with the sale of authorized insurance. **This Note has been delivered to Lender and accepted by Lender in the State of Texas. If there is a lawsuit, and if the transaction evidenced by this Note occurred in CAMERON County, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of CAMERON County, the State of Texas. This Note shall be governed by and construed in accordance with the laws of the State of Texas and applicable Federal laws.**

**RIGHT OF SETOFF.** Borrower grants to Lender a contractual security interest in, and hereby assigns, conveys, delivers, pledges, and transfers to Lender all Borrower's right, title and interest in and to, Borrower's accounts with Lender (whether checking, savings, or some other account), including without limitation all accounts held jointly with someone else and all accounts Borrower may open in the future, excluding however all IRA and Keogh accounts, and all trust accounts for which the grant of a security interest would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on this Note against any and all such accounts.

**RETURNED CHECK CHARGE.** In the event a check offered in full or partial payment on this loan is returned unpaid, Lender may charge a fee for the purpose of defraying the expense incident to handling such returned check, and Borrower agrees to pay such fee. The fee shall not exceed the maximum amount permitted under applicable law.

**ARBITRATION.** Except for "Core Proceedings" under the United States Bankruptcy Code, the bank and the Borrower agree to submit to binding arbitration all claims, disputes and controversies between or among them whether in tort, contract or otherwise, (and their respective employees, officers, directors, attorneys, and other agents) arising out of or relating to in any way (i) each and every debt, liability and obligation of every type and description which borrower may now or at any time hereafter owe to the Bank, whether such now exists or is hereafter created or incurred, whether it is currently contemplated by the Borrower and Bank, whether any documents evidencing it refer to this Agreement, whether it arises with or without any documents (e.g. obligations created by checking overdrafts), and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or (ii) any loan or security documents, and any loans' negotiation, execution, collateralization, administration, repayment, modification extension, substitution, formation, inducement, enforcement, default or termination or (iii) requests for additional credit. Any arbitration proceeding will (i) proceed in BROWNSVILLE, Texas; (ii) be governed by the Federal Arbitration Act (Title 9 of the United States Code), and (iii) be conducted in accordance with the Commercial Arbitration rules of the American Arbitration Association ("AAA").

The arbitration requirement does not limit the right of either party to (i) foreclose against real or personal property collateral; (ii) exercise self-help remedies relating to collateral or proceeds of collateral such as setoff or repossession; or (iii) obtain provisional ancillary remedies such as replevin injunctive relief, attachment or the appointment of a receiver, before during or after the pendency of any arbitration proceeding. This exclusion does not constitute a waiver of the right or obligation of either party to submit any dispute to arbitration, including those arising from the exercise of the

actions detailed in sections (i), (ii), and 9iii) of this paragraph.

Any arbitration proceeding will be before a single arbitrator selected according to the Commercial Arbitration Rules of the AAA. The arbitrator will be neutral attorney who has practiced in the area of commercial law for a minimum of ten years. The arbitrator will determine whether or not an issue is arbitrable and will give effect to the statutes of limitation in determining any claim. Judgement upon the award rendered by arbitrator may be entered in any court having jurisdiction.

Motion Practice. In any arbitration proceeding the arbitrator will decide (by documents only or with a hearing at the arbitrator's discretion ) any pre-hearing motions which a similar to motions to dismiss for failure to state a claim or motions for summary adjudication.

Discovery. In any arbitration proceedings discovery will be permitted and will be governed by the Texas Rules of civil procedure. All discovery must be completed no later than 20 days before the hearing date and within 180 days of the commencement of arbitration proceedings. Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final determination by the arbitrator upon a showing that the request for discover is essential for the party's presentation and that no alternative means for obtaining information is available.

Payment of Arbitration Costs and Fees. The arbitrator shall award costs and expenses of the arbitration proceeding in accordance with the provisions of the loan agreement, promissory note and/or other loan documents..

**GENERAL PROVISIONS.** NOTICE: Under no circumstances (and notwithstanding any other provisions of this Note) shall the interest charged, collected, or contracted for on this Note exceed the maximum rate permitted by law. The term "maximum rate permitted by law" as used in this Note means the greater of  (a) the maximum rate of interest permitted under federal or other law applicable to the indebtedness evidenced by this Note, or (b) the higher, as of the date of this Note, of the "Weekly Ceiling" or the "Quarterly Ceiling" as referred to in Sections 303.201 and 303.202 of the Texas Finance Code and Articles 1D.002, 1D.003 and 1D.006 of the Texas Credit Title respectively. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. In particular, this section means (among other things) that Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum Lender would be permitted to charge or collect by federal law or the law of the State of Texas (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to charge or collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan evidenced by this Note until payment in full so that the rate or amount of interest on account of the loan evidenced hereby does not exceed the applicable usury ceiling. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, protest, notice of dishonor, notice of intent to accelerate the maturity of this Note, and notice of acceleration of the maturity of this Note. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan, or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. BORROWER AGREES TO THE TERMS OF THE NOTE AND ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THE NOTE.**

BORROWER:

JULIE MARIE INC.

By: _Enriqueta H Barrera_
     ENRIQUETA H. BARRERA, PRESIDENT

Fixed Rate. Balloon.                    LASER PRO, Reg. U.S. Pat. & T.M. Off., Ver. 3.26 (c) 1999 CFI ProServices, Inc  All rights reserved. [TX-D20 25004.LN C3.OVL]

# RENEWAL, ENLARGEMENT AND MODIFICATION NOTE

**DATE:** May 4, 2000  **ORIGINAL NOTE DATE:** October 26, 1993

**MAKER:** Julie Marie, Inc.

**MAKER'S MAILING ADDRESS:** P. O. Box 711, Port Isabel, Texas 78578

**PAYEE:** Wells Fargo Bank Texas, N.A. (formerly FirstBank)

**PLACE FOR PAYMENT:** 1800 W. Highway 100, Port Isabel, Texas 78578

**PRINCIPAL AMOUNT:** $69,981.14     **ORIGINAL NOTE AMOUNT:** $30,000.00

**ANNUAL INTEREST ON UNPAID PRINCIPAL FROM DATE:** The interest on this Note is subject to change from time to time based on changes in an index which is the WELLS FARGO BANK TEXAS, N. A. BASE RATE (the "index"). THE INDEX IS THE RATE ESTABLISHED FROM TIME TO TIME BY WELLS FARGO BANK, N. A. AS ITS BASE RATE. Lender will tell me the current index rate upon my request. I understand that Lender may make loans based on other rates as well. The interest rate change will not occur more often than each day. The Index currently is **9.00%** per annum. The interest rate to be applied prior to maturity to the unpaid principal balance of this Note will be at a rate of **1.50 percentage** points over the Index, adjusted if necessary for the maximum rate limitation described below, resulting in an initial rate of **10.50%** per annum. Notwithstanding any other provision of this Note, the variable interest rate or rates provided for in this Note will be subject to the following maximum rate. NOTICE: Under no circumstances will the interest rate on this Note be more than the lesser of 18.000% per annum or the maximum rate allowed by applicable law. For purposes of this Note, the "maximum rate allowed by applicable law: means the greater of (a) the maximum rate of interest permitted under federal or other law applicable to the indebtedness evidenced by this Note, or (b) the "Weekly Rate" as referred to in Section 303.201 of the Texas Finance Code and Articles 10.002 and 10.003 of the Texas Credit Title. Unless waived by Lender, any increase in the Interest rate will increase the amounts of my interest payments.

**TERMS OF PAYMENT:** Payments of interest only shall be due and payable monthly for the months of February through July, beginning June 4, 2000 and continuing regularly and monthly through July 4, 2000, then payments of $2,184.00 principal plus interest beginning August 4, 2000, and continuing regularly and monthly through January 4, 2001, said payments will continue in a like manner, monthly and regularly as set out until May 4, 2003; at that time all principal and accrued interest shall be due and payable. Interest computed on the unpaid principal balance is payable monthly as it accrues on the same dates as and in addition to the installments of principal.

**PREFERRED MORTGAGE:**

> **Date:** October 26, 1993     **Owner:**     Julie Marie, Inc.
> **Mortgagee:** FirstBank (now known as Wells Fargo Bank Texas, N.A.)
> **Vessel:** Julie Marie     **Official No.:** 537957
> **Recording information:**     recorded on November 5, 1993, Book No.B-93/11, Instrument No.
> I-159

**The note is additionally secured by a security interest created in a security agreement executed by Enriqueta Barrera which grants a security interest in Certificate of Deposit No. 7950519812 in the principal amount of $75,000.00 issued by Norwest Bank Texas, N.A.**

Maker promises to pay to the order of Payee at the place for payment and according to the terms of payment the principal amount plus interest at the rates stated above. All unpaid amounts shall be due by the final scheduled payment date.

If Maker defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to it, and the default continues after Payee gives Maker notice of the default and the time within which it must be cured, as may be required by law or by written agreement, then Payee may declare the unpaid principal balance and earned interest on this note immediately due. Maker and each surety, endorser, and guarantor waive all demands for payment, presentations for payment, notices of intention to accelerate maturity, notices of acceleration of maturity, protests, and notices of protest, to the extent permitted by law.

If suit is brought on this Note, or if it is placed in the hands of an attorney for collection, or collected through the probate or Bankruptcy Courts, the undersigned agrees to pay the expenses of collection, including attorney's fees of Fifteen Percent (15%) of the principal and interest then due on this Note.

Interest on the debt evidenced by this note shall not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law; any interest in excess of that maximum amount shall be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess shall be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides other provisions in this and all other instruments concerning the debt.

This note is given in renewal and extension, but not in extinguishment of the note dated October 26, 1993, described herein. The principal amount of the note has been increased to $69,981.14.

Each Maker is responsible for all obligations represented by this note.

When the context requires, singular nouns and pronouns include the plural.

**THIS NOTE AND THE INSTRUMENTS BEING EXECUTED ALONG WITH IT REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

Julie Marie, Inc.

By:  *Enriqueta Barrera*

Enriqueta Barrera, President

# COMMERCIAL GUARANTY

| Principal | Loan Date | Maturity | Loan No | Call | Collateral | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

**Borrower:** Julie Marie, Inc. (TIN: 74-2132782)
P. O. Box 711
Port Isabel, TX 78578

**Lender:** WELLS FARGO BANK TEXAS, N.A.
PORT ISABEL OFFICE
1800 W. HIGHWAY 100
PORT ISABEL, TX 78578

**Guarantor:** Enriqueta H. Barrera
P. O. Box 711
Port Isabel, TX 78578

**AMOUNT OF GUARANTY.** The amount of this Guaranty is Unlimited.

**CONTINUING UNLIMITED GUARANTY.** For good and valuable consideration, Enriqueta H. Barrera ("Guarantor") absolutely and unconditionally guarantees and promises to pay to WELLS FARGO BANK TEXAS, N.A. ("Lender") or its order, in legal tender of the United States of America, the Indebtedness (as that term is defined below) of Julie Marie, Inc. ("Borrower") to Lender on the terms and conditions set forth in this Guaranty. Under this Guaranty, the liability of Guarantor is unlimited and the obligations of Guarantor are continuing.

**DEFINITIONS.** The following words shall have the following meanings when used in this Guaranty:

Borrower. The word "Borrower" means Julie Marie, Inc..

Guarantor. The word "Guarantor" means Enriqueta H. Barrera.

Guaranty. The word "Guaranty" means this Guaranty made by Guarantor for the benefit of Lender dated May 4, 2000.

Indebtedness. The word "Indebtedness" is used in its most comprehensive sense and means and includes any and all of Borrower's liabilities, obligations, debts, and indebtedness to Lender, now existing or hereafter incurred or created, including, without limitation, all loans, advances, interest, costs, attorneys' fees, debts, overdraft indebtedness, credit card indebtedness, lease obligations, other obligations, and liabilities of Borrower, or any of them, and any present or future judgments against Borrower, or any of them; and whether any such Indebtedness is voluntarily or involuntarily incurred, due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined; whether Borrower may be liable individually or jointly with others, or primarily or secondarily, or as guarantor or surety; whether recovery on the Indebtedness may be or may become barred or unenforceable against Borrower for any reason whatsoever; and whether the Indebtedness arises from transactions which may be voidable on account of infancy, insanity, ultra vires, or otherwise.

Lender. The word "Lender" means WELLS FARGO BANK TEXAS, N.A., its successors and assigns.

Related Documents. The words "Related Documents" mean and include without limitation all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**NATURE OF GUARANTY.** Guarantor's liability under this Guaranty shall be open and continuous for so long as this Guaranty remains in force. Guarantor intends to guarantee at all times the performance and prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, of all Indebtedness. Accordingly, no payments made upon the Indebtedness will discharge or diminish the continuing liability of Guarantor in connection with any remaining portions of the Indebtedness or any of the Indebtedness which subsequently arises or is thereafter incurred or contracted.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all other obligations of Guarantor under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at the address of Lender listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to advances or new indebtedness created after actual receipt by Lender of Guarantor's written revocation and Lender's written acknowledgment of receipt. For this purpose and without limitation, the term "new Indebtedness" does not include Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. This Guaranty will continue to bind Guarantor for all Indebtedness incurred by Borrower or committed by Lender prior to receipt of Guarantor's written notice of revocation, including any extensions, renewals, substitutions or modifications of the Indebtedness. All renewals, extensions, substitutions, and modifications of the Indebtedness granted after Guarantor's revocation, are contemplated under this Guaranty and, specifically will not be considered to be new Indebtedness. This Guaranty shall bind the estate of Guarantor as to Indebtedness created both before and after the death or incapacity of Guarantor, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation received by Lender from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of Indebtedness covered by this Guaranty, and it is specifically acknowledged and agreed by Guarantor that reductions in the amount of Indebtedness, even to zero dollars ($0.00), prior to written revocation of this Guaranty by Guarantor shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the guaranteed Indebtedness remains unpaid and even though the Indebtedness guaranteed may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening or otherwise affecting Guarantor's liability under this Guaranty, from time to time: (a) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (b) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (c) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (d) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (e) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (f) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (g) to sell, transfer, assign, or grant participations in all or any part of the Indebtedness; and (h) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (a) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (b) this Guaranty is executed at Borrower's request and not at the request of Lender; (c) Guarantor has full power, right and authority to enter into this Guaranty; (d) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (e) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (f) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present the financial condition of Guarantor as of the dates the financial information is provided; (g) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (h) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (i) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (j) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (a) to continue lending money or to extend other credit to Borrower; (b) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (c) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (d) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (e) to give notice of the terms, time, and place of any public or

private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (f) to pursue any other remedy within Lender's power; or (g) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor waives all rights of Guarantor under Chapter 34 of the Texas Business and Commerce Code. Guarantor also waives any and all rights or defenses arising by reason of (a) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (b) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (c) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (d) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (e) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced there is outstanding Indebtedness of Borrower to Lender which is not barred by any applicable statute of limitations; or (f) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**LENDER'S RIGHT OF SETOFF.** In addition to all liens upon and rights of setoff against the moneys, securities or other property of Guarantor given to Lender by law, Lender shall have, with respect to Guarantor's obligations to Lender under this Guaranty and to the extent permitted by law, a contractual security interest in and a right of setoff against, and Guarantor hereby assigns, conveys, delivers, pledges, and transfers to Lender all of Guarantor's right, title and interest in and to, all deposits, moneys, securities and other property of Guarantor now or hereafter in the possession of or on deposit with Lender, whether held in a general or special account or deposit, whether held jointly with someone else, or whether held for safekeeping or otherwise, excluding however all IRA, Keogh, and trust accounts. Every such security interest and right of setoff may be exercised without demand upon or notice to Guarantor. No security interest or right of setoff shall be deemed to have been waived by any act or conduct on the part of Lender or by any neglect to exercise such right of setoff or to enforce such security interest or by any delay in so doing. Every right of setoff and security interest shall continue in full force and effect until such right of setoff or security interest is specifically waived or released by an instrument in writing executed by Lender.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness of Borrower to Lender, whether now existing or hereafter created, shall be prior to any claim that Guarantor may have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness of Borrower to Lender. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender hereby is authorized, in the name of Guarantor, from time to time to execute and file financing statements and continuation statements and to execute such other documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty.

    **Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

    **Applicable Law.** This Guaranty has been delivered to Lender and accepted by Lender in the State of Texas. If there is a lawsuit, and if the transaction evidenced by this Guaranty occurred in Cameron County, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of Cameron County, State of Texas. This Guaranty shall be governed by and construed in accordance with the laws of the State of Texas and applicable Federal laws.

    **Attorneys' Fees.** In addition to the amount of this Guaranty set forth above, Lender may hire an attorney to help enforce this Guaranty if Guarantor does not pay, and Guarantor will pay all of Lender's attorneys' fees assessed by the court. Guarantor also will pay Lender all other amounts actually incurred by Lender as court costs, lawful fees for filing, recording, or releasing to any public office any instrument securing this Guaranty; the reasonable cost actually expended for repossessing, storing, preparing for sale, and selling any security; and fees for noting a lien on or transferring a certificate of title to any motor vehicle offered as security for this Guaranty.

    **Notices.** All notices required to be given by either party to the other under this Guaranty shall be in writing, may be sent by telefacsimile (unless otherwise required by law), and, except for revocation notices by Guarantor, shall be effective when actually delivered or when deposited with a nationally recognized overnight courier, or when deposited in the United States mail, first class postage prepaid, addressed to the party to whom the notice is to be given at the address shown above or to such other addresses as either party may designate to the other in writing. All revocation notices by Guarantor shall be in writing and shall be effective only upon delivery to Lender as provided above in the section titled "DURATION OF GUARANTY." If there is more than one Guarantor, notice to any Guarantor will constitute notice to all Guarantors. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address.

    **Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require, and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty. If a court of competent jurisdiction finds any provision of this Guaranty to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances, and all provisions of this Guaranty in all other respects shall remain valid and enforceable. If any one or more of Borrower or Guarantor are corporations or partnerships, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, or agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

    **Waiver.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**ARBITRATION.** Except for "Core Proceedings" under the United States Bankruptcy Code, the bank and the Borrower agree to submit to binding arbitration all claims, disputes and controversies between or among them whether in tort, contract or otherwise (and their respective employees, officers, directors, attorneys, and other agents) arising out of or relating to in any way (i) each and every debt, liability and obligation of every type and description which Borrower may now or at any time hereafter owe to the Bank, whether such now exists or is hereafter created or incurred, whether it is currently contemplated by the Borrower and Bank, whether any documents evidencing it refer to this Agreement, whether it arises with or without any documents (e.g. obligations created by checking overdrafts), and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or (ii) any loan or security documents, and any loans' negotiation, execution, collateralization, administration, repayment, modification, extension, substitution, formation, inducement, enforcement, default or termination of (iii)requests for additional credit. Any arbitration proceeding will (i) proceed in Victoria, Texas; (ii) be governed by the Federal Arbitration Act (Title 9 of the United States Code); and (iii) be conducted in accordance with the Commercial Arbitration rules of the American Arbitration Association ("AAA").

The arbitration requirement does not limit the right of either party to (i) foreclose against real or personal property collateral; (ii) exercise self-help remedies relating to collateral or proceeds of collateral such as setoff or repossession; or (iii) obtain provisional ancillary remedies such as replevin,

05-04-2000 **COMMERCIAL GUARANTY** Page 3
Loan No 9002 (Continued)

injunctive relief, attachment or the appointment of a receiver, before during or after the pendency or any arbitration proceeding. This exclusion does not constitute a waiver of the right or obligation of either party to submit any dispute to arbitration, including those arising from the exercise of the actions detailed in sections (i), (ii), and (iii) of this paragraph.

Any arbitration proceeding will be before a single arbitrator selected according to the Commercial Arbitration Rules of the AAA. The arbitrator will be a neutral attorney who has practiced in the area of commercial law for a minimum of ten years. The arbitrator will determine whether or not an issue is arbitrable and will give effect to the statutes of limitation in determining claim. Judgement upon the award rendered by arbitrator may be entered in any court having jurisdiction.

Motion Practice. In any arbitration proceeding the arbitrator will decide (by documents only or with a hearing at the arbitrator's discretion, any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication.

Discovery. In any arbitration proceedings discovery will be permitted and will be governed by the Texas Rules of Civil Procedure. All discovery must be completed no later that 20 days before the hearing date and with 180 days of the commencement of arbitration proceedings. Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final determination by the arbitrator upon a showing that the request for discover is essential for the party's presentation and that no alternative means for obtaining information is available.

Payment of Arbitration Costs and Fees. The arbitrator shall award costs and expenses of the arbitration proceeding in accordance with the provisions of the loan agreement, promissory note and/or other loan documents..

**NAME CHANGE.** Norwest Bank Texas, National Association will change/changed its name to Wells Fargo Bank Texas, National Association effective April 14, 2000.

**EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY." NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED MAY 4, 2000.**

GUARANTOR:

x _Enrique H. Barrera_
   **Enrique H. Barrera**

LASER PRO. Reg. U.S. Pat & T M. Off., Ver 3.28c (c) 2000 CFI ProServices, Inc. All rights reserved. [TX-E20 E3.28 61431.LN C2.OVL]

## COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call | Collateral | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|---|
| $69,981.14 | 05-04-2000 | 05-04-2003 | 9008 | | | 02668 | 83181 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

| Borrower: | Julie Marie, Inc. (TIN: 74–2132782) | Lender: | WELLS FARGO BANK TEXAS, N.A. |
|---|---|---|---|
| | P. O. Box 711 | | PORT ISABEL OFFICE |
| | Port Isabel, TX 78578 | | 1800 W. HIGHWAY 100 |
| | | | PORT ISABEL, TX 78578 |

THIS COMMERCIAL SECURITY AGREEMENT is entered into between Julie Marie, Inc. (referred to below as "Grantor"); and WELLS FARGO BANK TEXAS, N.A. (referred to below as "Lender"). For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**DEFINITIONS.** The following words shall have the following meanings when used in this Agreement. Terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. All references to dollar amounts shall mean amounts in lawful money of the United States of America.

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Collateral.** The word "Collateral" means the following described property of Grantor:

   **Fpsm M/V "Julie Marie"**

In addition, the word "Collateral" includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

   (a) All accessions, accessories, increases, and additions to and all replacements of and substitutions for any property described above.

   (b) All products and produce of any of the property described in this Collateral section.

   (c) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, or other disposition of any of the property described in this Collateral section.

   (d) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section.

   (e) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**Event of Default.** The words "Event of Default" mean and include without limitation any of the Events of Default set forth below in the section titled "Events of Default."

**Grantor.** The word "Grantor" means Julie Marie, Inc., its successors and assigns.

**Guarantor.** The word "Guarantor" means and includes without limitation each and all of the guarantors, sureties, and accommodation parties in connection with the Indebtedness.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note, including all principal and earned interest, together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. In addition, the word "Indebtedness" includes all other obligations, debts and liabilities, plus interest thereon, of Grantor, or any one or more of them, to Lender, as well as all claims by Lender against Grantor, or any one or more of them, whether existing now or later; whether they are voluntary or involuntary, due or not due, direct or indirect, absolute or contingent, liquidated or unliquidated; whether Grantor may be liable individually or jointly with others; whether Grantor may be obligated as guarantor, surety, accommodation party or otherwise.

**Lender.** The word "Lender" means WELLS FARGO BANK TEXAS, N.A., its successors and assigns.

**Note.** The word "Note" means the note or credit agreement dated May 4, 2000, in the principal amount of $69,981.14 from Julie Marie, Inc. to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for the note or credit agreement.

**Related Documents.** The words "Related Documents" mean and include without limitation all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**RIGHT OF SETOFF.** Grantor hereby grants Lender a contractual security interest in and hereby assigns, conveys, delivers, pledges, and transfers all of Grantor's right, title and interest in and to Grantor's accounts with Lender (whether checking, savings, or some other account), including all accounts held jointly with someone else and all accounts Grantor may open in the future, excluding, however, all IRA and Keogh accounts, and all trust accounts for which the grant of a security interest would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all Indebtedness against any and all such accounts.

**OBLIGATIONS OF GRANTOR.** Grantor warrants and covenants to Lender as follows:

**Organization.** Grantor is a corporation which is duly organized, validly existing, and in good standing under the laws of the state of Grantor's incorporation.

**Authorization.** The execution, delivery, and performance of this Agreement by Grantor have been duly authorized by all necessary action by Grantor and do not conflict with, result in a violation of, or constitute a default under  (a) any provision of its articles of incorporation or organization, or bylaws, or any agreement or other instrument binding upon Grantor or  (b) any law, governmental regulation, court decree, or order applicable to Grantor.

**Perfection of Security Interest.** Grantor agrees to execute such financing statements and to take whatever other actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper if not delivered to Lender for possession by Lender. Grantor hereby appoints Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue the security interest granted in this Agreement. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral. Grantor promptly will notify Lender before any change in Grantor's name including any change to the assumed business names of Grantor. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.**

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, the Collateral is enforceable in accordance with its terms, is genuine, and complies with applicable laws concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral.

**Removal of Collateral.** Grantor shall keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts, the records concerning the Collateral) at Grantor's address shown above, or at such other locations as are acceptable to Lender. Except in the ordinary course of its business, including the sales of inventory, Grantor shall not remove the Collateral from its existing locations without the prior written consent of Lender. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Texas, without the prior written consent of Lender.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this

EXHIBIT C
Page 1 of 4

05-04-2000
Loan No 9002

**COMMERCIAL SECURITY AGREEMENT**
(Continued)

Page 2

Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that it holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Maintenance and Inspection of Collateral.** Grantor shall maintain all tangible Collateral in good condition and repair. Grantor will not commit or permit damage to or destruction of the Collateral or any part of the Collateral. Lender and its designated representatives and agents shall have the right at all reasonable times to examine, inspect, and audit the Collateral wherever located. Grantor shall immediately notify Lender of all cases involving the return, rejection, repossession, loss or damage of or to any Collateral; of any request for credit or adjustment or of any other dispute arising with respect to the Collateral; and generally of all happenings and events affecting the Collateral or the value or the amount of the Collateral.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Compliance With Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any hazardous waste or substance, as those terms are defined in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 6601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or Federal laws, rules, or regulations adopted pursuant to any of the foregoing. The terms "hazardous waste" and "hazardous substance" shall also include, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for hazardous wastes and substances. Grantor hereby (a) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender. GRANTOR MAY FURNISH THE REQUIRED INSURANCE WHETHER THROUGH EXISTING POLICIES OWNED OR CONTROLLED BY GRANTOR OR THROUGH EQUIVALENT INSURANCE FROM ANY INSURANCE COMPANY AUTHORIZED TO TRANSACT BUSINESS IN THE STATE OF TEXAS. If Grantor fails to provide any required insurance or fails to continue such insurance in force, Lender may, but shall not be required to, do so at Grantor's expense, and the cost of the insurance will be added to the Indebtedness. If any such insurance is procured by Lender at a rate or charge not fixed or approved by the State Board of Insurance, Grantor will be so notified, and Grantor will have the option for five (5) days of furnishing equivalent insurance through any insurer authorized to transact business in Texas. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if it so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (a) the name of the insurer; (b) the risks insured; (c) the amount of the policy; (d) the property insured; (e) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (f) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**GRANTOR'S RIGHT TO POSSESSION.** Until default, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**EVENTS OF DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Default on Indebtedness.** Failure of Grantor to make any payment when due on the Indebtedness.

**Other Defaults.** Failure of Grantor to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or in any other agreement between Lender and Grantor.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by or on behalf of Grantor under this Agreement, the Note or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral documents to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against the Collateral or any other collateral securing the Indebtedness. This includes a garnishment of any of Grantor's deposit accounts with Lender.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or such Guarantor dies or becomes incompetent.

EXHIBIT C
Page 2 of 4

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender, in good faith, deems itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Texas Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness immediately due and payable, without notice.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter, provided Lender does so without a breach of the peace or a trespass, upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in its own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor reasonable notice of the time after which any private sale or any other intended disposition of the Collateral is to be made. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** To the extent permitted by applicable law, Lender shall have the following rights and remedies regarding the appointment of a receiver: (a) Lender may have a receiver appointed as a matter of right, (b) the receiver may be an employee of Lender and may serve without bond, and (c) all fees of the receiver and his or her attorney shall become part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in its discretion transfer any Collateral into its own name or that of its nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Cumulative Remedies.** All of Lender's rights and remedies, whether evidenced by this Agreement or the Related Documents or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and to exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Applicable Law.** This Agreement has been delivered to Lender and accepted by Lender in the State of Texas. If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of the State of Texas. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas and applicable Federal laws.

**Attorneys' Fees and Other Costs.** Lender may hire an attorney to help collect the Note if Grantor does not pay, and Grantor will pay all of Lender's attorneys' fees assessed by the court. Grantor also will pay Lender all other amounts actually incurred by Lender as court costs, lawful fees for filing, recording, or releasing to any public office any instrument securing the Note; the reasonable cost actually expended for repossession, storing, preparing for sale, and selling any security; and fees for noting a lien on or transferring a certificate of title to any motor vehicle offered as security for the Note, or premiums or identifiable charges received in connection with the sale of authorized insurance.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Notices.** All notices required to be given under this Agreement shall be given in writing, may be sent by telefacsimile (unless otherwise required by law), and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier or deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address shown above. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. To the extent permitted by applicable law, if there is more than one Grantor, notice to any Grantor will constitute notice to all Grantors. For notice purposes, Grantor will keep Lender informed at all times of Grantor's current address(es).

**Power of Attorney.** Grantor hereby appoints Lender as its true and lawful attorney-in-fact, irrevocably, with full power of substitution to do the following: (a) to demand, collect, receive, receipt for, sue and recover all sums of money or other property which may now or hereafter become due, owing or payable from the Collateral; (b) to execute, sign and endorse any and all claims, instruments, receipts, checks, drafts or warrants issued in payment for the Collateral; (c) to settle or compromise any and all claims arising under the Collateral, and, in the place and stead of Grantor, to execute and deliver its release and settlement for the claim; and (d) to file any claim or claims or to take any action or institute or take part in any proceedings, either in its own name or in the name of Grantor, or otherwise, which in the discretion of Lender may seem to be necessary or advisable. This power is given as security for the Indebtedness, and the authority hereby conferred is and shall be irrevocable and shall remain in full force and effect until renounced by Lender

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

**Successor Interests.** Subject to the limitations set forth above on transfer of the Collateral, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**Waiver.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**NAME CHANGE.** Norwest Bank Texas, National Association will change/changed its name to Wells Fargo Bank Texas, National Association effective April 14, 2000.

EXHIBIT C
Page 3 of 4

05-04-2000                    **COMMERCIAL SECURITY AGREEMENT**                    Page 4
Loan No 9002                          (Continued)

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT, AND GRANTOR
AGREES TO ITS TERMS. THIS AGREEMENT IS DATED MAY 4, 2000.

GRANTOR:

Julie Marie, Inc.

By: _Enriqueta H. Barrera_____
     Enriqueta H. Barrera, President

LASER PRO, Reg U S Pat & T.M Off , Ver 3.26c (c) 2000 CFI ProServices, Inc. All rights reserved [TX-E40 E3 28 F3 28 61431 LN C2.OVL]

EXHIBIT C
Page 4 of 4

AMENDMENT TO FIRST PREFERRED MORTGAGE

On October 26, 1993, Julie Marie, Inc. (100% Mortgagor and sole owner) of P.O. Box 711, Port Isabel, Texas 78578, executed a First Preferred Mortgage on the Julie Marie, Official Number 537957, in favor of FirstBank (100% Mortgagee), as recorded in the Coast Guard Records under Book B-93/11, Instrument No. I-159 on November 5, 1993; and

Mortgagee is now known as Wells Fargo Bank Texas, N.A., and Mortgagee's address is 1800 W. Highway 100, Port Isabel, Texas 78578;

THAT the amount of the note has been increased to $69,981.14; and

THAT the maturity date of the note has been extended to May 4, 2003.

The undersigned Mortgagee and Mortgagor further warrant that said Mortgage is genuine and in all respects what it purports to be as amended; all statements therein contained are true; and the parties hereto hereby waive notice of acceptance hereof.

Dated May 4, 2000.

Julie Marie, Inc.

By: _Enriqueta Barrera_
Enriqueta Barrera, President

WELLS FARGO BANK TEXAS, N.A.

By: _____
Sammy Reyes

THE STATE OF TEXAS
COUNTY OF CAMERON

BEFORE ME, the undersigned authority, on this day personally appeared Enriqueta Barrera, President of Julie Marie, Inc. known to me to be the officer whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed same in the capacity stated herein for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this __31st__ day of __MAY__, 2000.

_____
NOTARY PUBLIC, STATE OF TEXAS

MARIA M. ROSALES
Notary Public
STATE OF TEXAS
My Comm. Exp. Aug. 9, 2003

THE STATE OF TEXAS
COUNTY OF CAMERON

BEFORE ME, the undersigned authority, on this day personally appeared Sammy Reyes, Business Banker of Wells Fargo Bank Texas, N.A., known to me to be the officer whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed same in the capacity stated herein for the purposes and consideration therein expressed.

GIVEN UNDER MAY HAND AND SEAL OF OFFICE this __31st__ day of __MAY__, 2000.

_____
NOTARY PUBLIC, STATE OF TEXAS

MARIA M. ROSALES
Notary Public
STATE OF TEXAS
My Comm. Exp. Aug. 9, 2003

EXHIBIT D
Page 1 of 1

12 JUN 00
NATIONAL VESSEL DOCUMENTATION CENTER
RECORDED IN BOOK 0076 PAGE/INST 134
DOCUMENTATION OFFICER
12:00 PM

# Cash Flow Credit Line Agreement

THIS CASH FLOW CREDIT LINE AGREEMENT (the "Agreement") Loan Account No _____ 808-1994212-0001 _____ is entered into __June 13, 2001__ , by and between __Julie Marie, Inc.__

(whether one or more, the "Borrower") and _____ Wells Fargo Bank Texas, National Association _____ (the "Bank"). This Agreement covers the Borrower's Cash Flow Credit Line with the Bank. The Borrower agrees that all loan proceeds under this Cash Flow Credit Line will be used exclusively for ☒ business purposes ☐ agricultural purposes. No loan proceeds will be used for the purchase or refinancing, in whole or in part, of a one-to-four family residential property

**1. Cash Flow Credit Line Loans.** Subject to the terms and conditions in this Agreement, the Bank will give the Borrower an automatic loan from this Cash Flow Credit Line whenever:
☒ The Borrower overdraws Borrower's checking account # __3640081310__ or that checking account becomes overdrawn for any other reason acceptable to the Bank. Each automatic loan will be $ __1,000.00__ or as many times that amount as is needed to cover the overdraft, and it will be deposited in the Borrower's checking account.
☐ The Borrower reduces the balance in Borrower's checking account # _____ below $ _____ (the "Minimum Balance") or the balance in that checking account falls below the Minimum Balance for any other reason acceptable to the Bank. Each automatic loan will be $ _____ or as many times that amount as is needed to maintain the Minimum Balance, and it will be deposited in the Borrower's checking account.
☐ The Borrower draws a special draft on the Borrower's Cash Flow Credit Line account by use of the forms provided by the Bank. The minimum amount of each draft must be at least $ _____

The Borrower also may request a loan from this Cash Flow Credit Line in person or by phone, provided the loan is at least $ __1,000.00__ . Any such loan will be deposited in the Borrower's checking account (described above), unless the Bank and Borrower agree otherwise
(If the amount available to borrow from this Cash Flow Credit Line is less than the regular automatic loan amount, minimum special draft or loan amount shown above, then the Bank may, at its option, make an automatic loan, honor any special draft or make a loan for less than the automatic or minimum amount.)
**2. Credit Limit/Promise to Pay.** The Borrower's Cash Flow Credit Line limit is $ __25,000.00__ . The Bank is not obligated to make any loan to the Borrower that would cause the unpaid loan balance under this Cash Flow Credit Line to exceed that limit. If the Bank elects to make such a loan, the Bank may treat the loan as a Cash Flow Credit Line loan, subject to an Overline Fee, and require repayment of the unpaid loan balance in excess of the credit limit (the "Overline Amount") with the regular monthly payment. The Borrower promises to pay the Bank, when due, the unpaid loan balance, together with interest, fees, and charges due on this Cash Flow Credit Line.
**3. Termination.** This Cash Flow Credit Line Agreement will terminate:
☒ on __February 15, 2003__ (the "Termination Date" and the "Maturity Date"). The Bank will make the loans (described in the Section entitled "Cash Flow Credit Line Loans") under this Cash Flow Credit Line until the Termination Date or until any early termination for default or any restriction on future loans as provided in this Agreement. The Termination Date also will be the Maturity Date when the final "balloon" payment is due. (See the Section entitled "Final Payment", page 2)
☐ on the date the Bank sends written notice to the Borrower terminating the Cash Flow Credit Line (the "Termination Date"). The Bank may terminate this line at any time. The Bank will make Cash Flow Credit Line loans until the Termination Date or until any early termination for default or any restriction on future loans as provided in this Agreement.
The Borrower may terminate this Cash Flow Credit Line at any time by notifying the Bank. (Either Borrower may terminate this Cash Flow Credit Line if it is a joint account.) The Bank may immediately terminate this Cash Flow Credit Line if the Borrower closes any checking account of the Borrower described herein. Upon termination, the Borrower must repay the unpaid loan balance, along with interest, fees and charges.
**4. Interest.** Interest on each Cash Flow Credit Line Loan will begin to accrue on the day it is made. Interest will be charged on the unpaid loan balance, based on the actual number of days elapsed in a year of __360__ days, at:
☐ a fixed annual rate of _____ %.
☒ an initial annual rate equal to __11.00__ %, which will be adjusted on a ☐ Monthly Basis (as described below) ☒ Floating Basis (as described below):
☐ to equal the Index Rate.
☒ to equal __4.00__ % __above__ the Index Rate.

__Monthly Basis:__ Each adjustment will take effect on the first day of every month, using the Index Rate in effect on the last day of the prior month.

__Floating Basis:__ Each adjustment will occur as and when the Index Rate changes.
"Index Rate" means:
☒ the "Base Rate" which is the rate of interest established by Wells Fargo Bank Texas, N.A. from time to time as its "base" or "prime" rate
☐ the "Wall Street Rate" which is the highest "prime" rate of interest published in the Wall Street Journal "Money Rates" Table
☐ the _____

In the case of a variable interest rate based on the Index Rate, the actual interest rate charged will never exceed the maximum rate permitted by law.
**5. Amount of Fees/Charges.** The Borrower agrees to pay the following fees and charges, which are described in greater detail under the Section entitled "Provisions Relating to Fees/Charges".

| | |
|---|---|
| Facility Origination Fee | $ N/A |
| Annual Fee | $ N/A |
| Overline Fee | $ N/A |
| Return Draft Fee | $ 25.00 |
| Stop Payment Fee | $ 25.00 |
| Return Payment Fee | $ N/A |
| _____ Fee | $ N/A |
| _____ Fee | $ N/A |

Late Fee (equal to the following amount) if any regular minimum monthly payment is not paid in full within __N/A__ days of its scheduled due date
☐ $ _____
☐ _____ % of the unpaid amount of the scheduled regular minimum monthly payment.
☐ the _____ of $ _____ or _____ % of the unpaid amount of the scheduled regular minimum monthly payment.
☒ No late fee will be charged

**6. Monthly Payments.** The Borrower agrees to make monthly payments as follows:
__Billing or Automatic Debit:__ To repay the Cash Flow Credit Line loans, the Bank will each month.
☐ provide the Borrower with a bill stating the total payment due. The total payment due includes the Borrower's regular minimum monthly payment (described below), together with any past due regular minimum monthly payment(s) and all fees and charges then due on this Cash Flow Credit Line.
☒ automatically charge the Borrower's checking account number __3640081310__ for the regular minimum monthly payment(s) (described below) then due plus any Annual Fee then due. If this account does not have enough money in it to make this automatic payment, the Bank may, but is not required to, make the Borrower a loan from this Cash Flow Credit Line to make the payment. (Any other fees and charges due must be paid separately. The Bank may, at its option, charge this same account for these other fees and charges if they are not paid when due.)

__Payment Due Date.__ The Borrower's regular minimum monthly payment will be calculated on the day the Borrower's monthly statement is prepared and will be due on:
☒ the due date shown in that statement (which will be approximately __15__ days after the date of the statement)
☐ _____ and on the same calendar day of each month thereafter (unless such calendar day does not fall in a particular month, in which case it will be due on the last calendar day of such month.) Non-combined statements only.
☐ _____ and on the last day of each month thereafter. Non-combined statements only.

*Payment Amount*   Each regular minimum monthly payment will be the following amount (plus any Overline Amount)
☐ a fixed amount of $_____
☐ an amount equal to the greater of $_____ or
    _____ % of the unpaid loan balance.
☒ an amount equal to the accrued interest (and credit insurance premium, if any) owing.
☐ an amount equal to the accrued interest (and credit insurance premium, if any) owing; plus the following additional amount:
    ☐ a fixed amount of $_____
    ☐ an amount equal to the greater of $_____ or
        _____ % of the unpaid loan balance.
☐ an amount equal to the accrued interest (and credit insurance premium, if any) owing; in addition, a Periodic Payment will be due in certain months (as described below).

*Periodic Payment*.  A Periodic Payment will be calculated on the day the Borrower's monthly statement is prepared each _____ and will be due on:
☐ the due date shown on each such statement (which will be approximately _____ days after the date of that statement). The Borrower's first monthly statement showing a Periodic Payment will be prepared approximately _____ months after
    the date of this Agreement.  Non-combined statements only.
☐ _____ and continuing on the same calendar day of each _____ thereafter (unless such calendar day does not fall in the month ending such period, in which case it will be due on the last calendar day of such
    month.)  Non-combined statements only.
    The Periodic Payment will be in the following amount.
    ☐ a fixed amount of $_____
    ☐ an amount equal to the greater of $_____ or
        _____ % of the unpaid loan balance.

*Prepayment*.  The Borrower may prepay any amounts outstanding under this Cash Flow Credit Line at any time, in whole or in part, without premium or penalty.  Any prepayment shall be applied as described in the Section entitled "Application of Payments."
**7.  Final Payment**.  If this Cash Flow Line of Credit has a Maturity Date (see the Section entitled "Termination", page 1), the Borrower must pay the unpaid loan balance, together with any interest, fees and other charges, in a single "balloon" payment on the Maturity Date. Whether or not this Cash Flow Credit Line has a Maturity Date, in the event of default, the unpaid loan balance, together with any interest, fees and other charges, may be accelerated (see the Section entitled "Remedies"), and the Bank may automatically charge any of the Borrower's checking or other accounts with the Bank for such amounts
**8.  Security**.  This Cash Flow Credit Line is secured by any security agreement, collateral pledge, assignment, or other separate security instrument which the Borrower has executed, is executing, or may in the future execute in favor of the Bank.

☐ If this box is checked, this Cash Flow Credit Line also is secured by the Borrower's mortgage or deed of trust in favor of the Bank dated _____

**9.  Provisions Relating to Fees/Charges**.  The fees and charges shown under the Section entitled "Amount of Fees/Charges" and described below apply to this Cash Flow Credit Line.  Except for the Facility Origination Fee (which is due and payable when this Agreement is signed), these fees and charges will be due and payable after the close of the billing cycle during which such fees and charges are assessed, on the same due date as the Borrower's regular minimum monthly payment for that billing cycle (as specified in the monthly statement)

*Facility Origination Fee*:  The Borrower agrees to pay to the Bank the Facility Origination Fee shown on the first page of this Agreement for the origination and initial processing of this Cash Flow Credit Line.

*Annual Fee*.  The Borrower agrees to pay to the Bank the annual fee shown on the first page of this Agreement.  The fee will be assessed in the first billing cycle and in each billing cycle thereafter that falls on the anniversary date of this Cash Flow Credit Line.  The fee is payable at the same time that the Borrower's regular minimum monthly payment is due for such billing cycle.

*Overline Fee*:  The Borrower agrees to pay the Bank the Overline Fee shown on the first page of this Agreement each time the Bank, at its sole discretion, makes any loan which (when added to the Borrower's unpaid loan balance) exceeds the Borrower's credit limit.  (If state law limits this fee to one fee per billing period, only one Overline Fee will be charged during such billing period.)

*Return Draft Fee*:  The Borrower agrees to pay to the Bank the return

draft fee shown on the first page of this Agreement for any special draft drawn on the Cash Flow Credit Line that the Bank returns unpaid because the Borrower is in default, this Cash Flow Credit Line is restricted, or payment of the draft would cause the unpaid loan balance to exceed the Borrower's credit limit

*Stop Payment Fee*:  The Borrower agrees to pay to the Bank the stop payment fee shown on the first page of this Agreement if the Borrower notifies the Bank to stop payment on any draft drawn directly on this Cash Flow Credit Line.

*Return Payment Fee*:  The Borrower agrees to pay to the Bank the return payment fee shown on the first page of this Agreement for any check, instrument, or ACH transfer made as payment on this Cash Flow Credit Line which is returned unpaid for any reason.

*Late Fee*:  The Borrower agrees to pay to the Bank the late fee shown on the first page of this Agreement if any regular minimum monthly payment is not paid in full within the specified number of days of its scheduled due date.
The assessment of any fee or charge does not abrogate any of the Bank's rights to terminate or restrict this Cash Flow Line of Credit in accordance with the provisions of this Agreement.

*Additional Fees*.  The Borrower agrees to pay to the Bank any additional fees shown on the first page of this Agreement.
**10.  Stop Payment Terms for Drafts**.  To be effective, a stop payment order (an "order") must contain the Borrower's name and account number, the number and exact amount of the draft, and the name of the party to whom the draft is payable.  It also must be received in a time and manner that gives the Bank a reasonable opportunity to act on it. An order will be in effect for six months, however, the Bank reserves the right to remove an oral order after 14 days if the Borrower fails to confirm the order in writing within that time  The Borrower may renew an order in writing every six months.  The Bank may pay the Borrower's draft after an order has expired even though the draft is more than six months old.  The bank will have no liability to the Borrower if any of the information that the Borrower provides in the order is incorrect and the Bank pays the draft.
**11.  Application of Payments**.  If the borrower has elected a regular minimum monthly payment equal to the accrued interest (and credit insurance premiums, if any) owing, the Bank will apply payments that the Borrower makes to billed but unpaid amounts in the following order: (i) interest and any credit insurance premiums, (ii) annual fees, (iii) remaining types of fees and charges, and (iv) the unpaid loan balance (principal).
If the Borrower has elected any other regular minimum monthly payment method, the Bank will apply payments that the Borrower makes to billed but unpaid amounts in the following order  (i) interest and any credit insurance premiums, (ii) unpaid loan balance (principal), (iii) annual fees, and (iv) remaining types of fees and charges.
Any amounts paid in excess of billed but unpaid amounts will be applied to the unpaid loan balance (principal), but will not excuse the Borrower from making successive regular minimum monthly payments.
**12.  Representation of Corporation, Partnership, Limited Liability Company, or Organization**.  In the event that the Borrower is a corporation, partnership (of any kind) limited liability company, or organization, the Borrower represents that the person(s) signing below has (have) the representative capacity and authority to execute this Agreement on behalf of such corporation, partnership, limited liability company, or organization
**13.  Financial Statements**.  The Borrower and any guarantor(s) will promptly complete current financial statements (in form satisfactory to the Bank) and deliver such statements and any recent federal income tax returns to the Bank whenever the Bank requests such financial statements and/or tax returns, whether annually or otherwise from time to time.  The Bank will use these statements, tax returns, and other information to review the Borrower's and guarantor(s)' financial condition.
**14.  Restrictions on Future Loans**.  In addition to the Bank's right to terminate this Cash Flow Credit Line, the Bank also can refuse to make further loans (without terminating this Cash Flow Credit Line) if (i) the Borrower is in default, (ii) the Borrower does not furnish the Bank with current financial statements and/or tax returns when requested by the Bank (see the Section entitled "Financial Statements"), or (iii) the Bank determines, based on the Borrower's current financial statements, a recent credit report or other information, that there has been a material change in the Borrower's financial circumstances which may (now or in the future) impair the Borrower's ability to repay any additional loans.  If, for example, the Borrower incurs substantial new debts after the date of this Agreement, the Bank can refuse to make further loans
**15.  Default**.  The Borrower will be in default under this Agreement if any one or more of the following occur.
a.    The Borrower does not make any payment when due;
b.    The Borrower fails to comply with any other term or condition in this Agreement or in any other agreement or instrument with the Bank;
c.    Someone else begins legal action to take any money from any of the Borrower's accounts with the Bank;

EXHIBIT E
Page 2 of 4

d    The Borrower is bankrupt or insolvent;

e    The Borrower dies (in the case of an individual) or dissolves or l Liquidates (in the case of a partnership, corporation or other entity);

f    Any guarantor of this Cash Flow Credit Line is bankrupt or insolvent,

g.   Any guarantor of this Cash Flow Credit Line dies (in the case of an individual) or dissolves or liquidates (in the case of a partnership, corporation or other entity);

h    The Borrower changes its legal entity status (without the Bank's written consent),

i    The Bank, in good faith, determines that there has been a material change in the Borrower's financial circumstances which may (now or in the future) impair the Borrower's ability to repay any outstanding Cash Flow Credit Line loans; or

j    The Bank terminates any checking account of the Borrower described herein because the Bank has a reasonable basis to believe that the account has been inactive, misused or mismanaged

**18. Remedies**  If the Borrower dies (in the case of an individual) or is bankrupt or insolvent (in any case), this Cash Flow Credit Line will automatically terminate and the entire unpaid loan balance, together with interest, fees and charges, outstanding under it will automatically become due and payable without notice or demand.  In the case of any other default, the Bank may, at any time, terminate this Cash Flow Credit Line and demand that the Borrower immediately pay the entire unpaid loan balance, together with interest, fees and charges, outstanding under it.  In the case of any default, the Bank may refuse to make further loans and/or enforce any rights and remedies it has against the Borrower or any collateral or guarantor, and the Borrower agrees to pay reasonable attorneys' fees and other costs of collection, unless prohibited by law.

**17. The Bank's Right of Set off.**  The Bank has the right of setoff This means that the Bank has the right to take any money that the Borrower has on deposit with the Bank to pay any amounts that the Borrower owes under this Agreement

**18. Cumulative Rights and Remedies.**  Mere delay or failure to act will not preclude the exercise or enforcement of any of the rights and remedies of the Bank.  All rights and remedies of the Bank are cumulative and may be exercised singularly or concurrently, at the Bank's option  The exercise or enforcement of any one such right or remedy will neither be a condition to nor bar to the exercise or enforcement of any other.  (If this Cash Flow Credit Line is a joint account, each Borrower who signs this Agreement is jointly and severally liable for the unpaid loan balance, together with interest, fees and charges, outstanding under this Cash Flow Credit Line.)

**19. Liability for Loan Advances Made by Other Checking Account Owner/Signers.**  The Borrower understands and agrees that the Borrower is fully responsible and liable for any and all loans, finance charges and other charges outstanding on the Cash Flow Credit Line now or at any time in the future, whether the checks, transfers, withdrawals and/or charges that created or increased the balance on this Cash Flow Credit Line were initiated or authorized by the Borrower or any co-owner of or authorized signer for the checking account(s) for which this Cash Flow Credit Line provides overdraft protection.

**20. Miscellaneous.**  This Agreement may be amended only by a written agreement signed by the Borrower and the Bank, except for minor adjustments in the amount of the Overline Fee, Return Draft Fee, Stop Payment Fee, and Return Payment Fee which the Bank may make from time to time.  If any provision of this Agreement is held invalid under applicable law, such invalidity will not affect any other provision of this Agreement that can be given effect without such invalid provision, and, to this end, the provisions of this Agreement are severable.  This Agreement is governed by the law of the state in which the Bank is located.

**21. Agreement to Arbitrate.**  The Bank and Borrower agree to submit to binding arbitration all claims, disputes and controversies (whether in tort, contract, or otherwise, except "core proceedings" under the U.S. Bankruptcy Code) arising between themselves and their respective employees, officers, directors, attorneys and other agents, which relate in any way (without limitation) to existing and future loans and extensions of credit or requests for additional credit, including by way of example but not by way of limitation the negotiation, collateralization, administration, repayment, modification, default, termination and enforcement of such loans or extensions of credit.

Arbitration under this Agreement will be governed by the Federal Arbitration Act (except in Colorado where it will be governed by Colorado law), proceed in the state and city in which the Bank's principal office is located or some other mutually agreeable location and be conducted by the American Arbitration Association ("AAA") in accordance with the AAA's arbitration rules ("AAA Rules") and the following provisions:

Selection of Arbitrator.  Arbitration will be conducted before a single neutral arbitrator selected in accordance with AAA Rules and who will be an attorney who has practiced commercial law for at least 10 years

Statutes of Limitation and Procedural Issues  The arbitrator will determine whether an issue is arbitratable and will give effect to applicable statutes of limitation.  Judgment upon the arbitrator's such action for judicial relief.  The arbitrator has the discretion to award may be entered in any court having jurisdiction.  The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests decide, upon documents only or with a hearing, any motion to dismiss for failure to state a claim or any motion for summary judgment.

Discovery.  Discovery will be governed by State Rules of Civil Procedure for the state in which the Bank's principal office is located.  Discovery must be completed at least 20 days before the hearing date and within 180 days of the commencement of arbitration.

Each request for an extension and all other discovery disputes will be determined by the arbitrator upon a showing that the request is essential for the party's presentation and that no alternative means for obtaining information are available during the initial discovery period.

Exceptions to Arbitration.  This Agreement does not limit the right of either party to (i) foreclosure against real or personal property collateral; (ii) exercise self-help remedies such as setoff or repossession; (iii) obtain provisional remedies such as replevin, injunctive relief, attachment or the appointment of a receiver during the pendency or before or after any arbitration proceeding; or (iv) obtain a cognitive judgment, if available.  These exceptions do not constitute a waiver of the right or obligation of either party to submit any dispute to arbitration, including those arising from the exercise of these remedies.

Arbitration Costs and Fees.  The arbitrator will award costs and expenses in accordance with the provisions of the documents evidencing each loan or extension of credit.

**22. Optional Credit Insurance.**  If the Borrower is an individual, he and/or she may purchase credit life insurance from the Bank.  The purchase of credit life insurance is optional and not required as a condition of obtaining this Cash Flow Credit Line.

Any credit life insurance is governed by the terms, conditions and limitations of coverage described in the certificate of insurance.  The daily rate for single and joint credit life insurance and the corresponding cost per $100 of the Borrower's average daily unpaid loan balance each monthly period are shown below:

| | Single Life Ins | Joint Life Ins |
|---|---|---|
| Daily Rate | _____% | _____% |
| Cost per $100 | $_____ | $_____ |

The Borrower elects to purchase the following credit insurance:
☐ Single Credit Life Insurance
☐ Joint Credit Life Insurance
☒ No Insurance

**If the Bank is located in Nebraska:**  A credit agreement must be in writing to be enforceable under law.  To protect you and us from any misunderstandings or disappointments, any contract, promise, undertaking or offer to forebear repayment of money or to make any other financial accommodation in connection with this loan of money or grant an extension of credit, or any amendment of, cancellation of, waiver of, or substitution for any or all of the terms or provisions of any instrument or document executed in connection with  this loan of money or grant or extension of credit, must be in writing to be effective.

**If the Bank is located in Iowa:**  IMPORTANT:  READ BEFORE SIGNING.  THE TERMS OF THIS NOTE AND AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE.  NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED.  YOU MAY CHANGE THE TERMS OF THIS NOTE AND AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.  THIS NOTICE ALSO APPLIES TO ANY OTHER CREDIT AGREEMENTS (EXCEPT CONSUMER LOANS OR OTHER EXEMPT TRANSACTIONS) NOW IN EFFECT BETWEEN THE BORROWER AND THE BANK.  BY SIGNING THIS AGREEMENT, THE BORROWER ACKNOWLEDGES RECEIPT OF A COPY OF THIS AGREEMENT.

**If the Bank is located in Texas:**  THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENT BETWEEN THE PARTIES.  CHAPTER 346 OF THE TEXAS FINANCE CODE OR ANY SUCCESSOR STATUTE WHICH REGULATES CERTAIN REVOLVING LOAN ACCOUNTS SHALL NOT APPLY TO THIS AGREEMENT.  IN NO EVENT SHALL THE RATE OF INTEREST CONTRACTED, CHARGED OR COLLECTED FOR ON THIS AGREEMENT EXCEED THE MAXIMUM RATE PERMITTED BY FEDERAL LAW OR THE LAW OF THE STATE OF TEXAS (AS APPLICABLE).  THE BORROWER AND THE BANK DO NOT AGREE OR INTEND THAT THE BORROWER CONTRACT FOR OR BE CHARGED (OR THE BANK COLLECT OR RECEIVE) ANY AMOUNT WHATSOEVER, WHETHER IN THE FORM OF INTEREST OR A FEE, WHICH MAY CAUSE THE BANK TO COLLECT OR RECEIVE MORE THAN THE MAXIMUM AMOUNT PERMITTED BY APPLICABLE LAW.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, ANY EXCESS INTEREST OR UNAUTHORIZED FEE SHALL BE FIRST APPLIED TO REDUCE THE PRINCIPAL BALANCE OF THIS AGREEMENT, AND UPON PAYMENT IN FULL OF THE PRINCIPAL OF THIS AGREEMENT, BE REFUNDED TO THE BORROWER. NOTICE TO TEXAS RESIDENTS: IF THIS LOAN IS A HOME EQUITY LOAN SECURED BY A HOMESTEAD IN TEXAS, THE OCCURRENCE OF THE FOLLOWING WILL NOT RESULT IN ACCELERATION AND DEMAND FOR PAYMENT OR FORECLOSURE: DECREASE IN THE MARKET VALUE OF THE HOMESTEAD AND DEFAULT UNDER THE TERMS OF OTHER INDEBTEDNESS **NOT** SECURED BY THE HOMESTEAD.

**If the Bank is located in Minnesota:** This extension of credit is made under: (i) Minn. Stat. 47.204 if this Agreement is from an individual and is secured by a first lien on residential real estate; (ii) Minn. Stat. 334.01, subd. 2, if the initial advance under this Agreement is $100,000.00 or more and it is not secured by a first lien on residential real estate.

**If the Bank is located in North Dakota:** In all events the interest rate shall be the same rate after the Maturity Date as was in effect on the Maturity Date. If this Agreement is secured by a mortgage on real property located in North Dakota except a first mortgage: **THIS OBLIGATION MAY BE THE BASIS FOR A PERSONAL ACTION AGAINST THE PROMISOR OR PROMISORS IN ADDITION TO THE OTHER REMEDIES ALLOWED BY LAW.** (The term "Promisor" or "Promisors" means the Borrower herein). If the Agreement is secured by a mortgage on commercial real property located in North Dakota, the Bank has the right, following an event of default, to proceed to obtain and collect a deficiency judgment, together with foreclosure of the real property mortgaged under applicable laws.

**If the Bank is located in New Mexico:** The undersigned hereby acknowledges that I am aware of the provisions of Section 58-6-5 NMSA 1978 Comp., which require a contract, promise or commitment to loan money or to grant, extend or renew credit or any modification thereof, in an amount greater than $25,000.00, not primarily for personal, family or household purposes, to be in writing and signed by the party to be charged or that party's authorized representative.

This Agreement is executed as of the day and year first above written. By signing below, the Borrower acknowledges receiving a copy of this Agreement

## Signatures

Borrower's Name
  Julie Marie, Inc.

| Signature<br>X *Enriqueta H. Barrera* | Signature<br>X |
|---|---|
| Name and Title (if applicable)<br>  Enriqueta H. Barrera, President | Name and Title (if applicable) |
| Signature<br>X | Signature<br>X |
| Name and Title (if applicable) | Name and Title (if applicable) |

Bank's Name
  Wells Fargo Bank Texas, N.A.

| Signature | Title BUSINESS BANKER |
|---|---|